UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLUB XTREME, INC. and
ROBERT WOJTOWICZ,                          Case No. 07-15308

Plaintiffs,                                Hon. Victoria A. Roberts

v.

THE CITY OF WAYNE, AL HAIDOUS,
JOHN WILLIAMS, AL DAMITIO,
PAM DOBROWOLSKI and JOHN ZECH,

Defendants

_____/

## ORDER

## I.    INTRODUCTION

Plaintiffs Robert Wojtowicz ("Wojtowicz") and Club Xtreme, Inc. ("Club Xtreme" or "the Club") bring this civil rights action against Defendants City of Wayne ("the City"), Mayor Al Haidous, Mayor Pro Tem Pam Dobrowolski, Police Chief John Williams, City Manager John Zech and City Council member Albert Damitio.  The matter is now before the Court on Defendants' Motion for Summary Judgment [Dkt #33], filed December 23, 2009.  Plaintiffs filed a Response.  For the reasons stated, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.   BACKGROUND

As the Court is compelled to do on a  Fed. R. Civ. P 56(c) motion for summary judgment, it construes the evidence in the light most favorable to Plaintiffs.

Wojtowicz was the sole shareholder of Club Xtreme, Inc., a Michigan corporation which operated a nightclub called Club Xtreme. Club Xtreme opened on June 4, 2004, after protracted wrangling with the City regarding the site plan and building permits. At one point, Plaintiffs filed suit against the City in state court in order to have their building plans approved; that case was later dismissed.

Club Xtreme was a licensed liquor establishment which served alcoholic beverages. It was the first nightclub of its kind in the City and also the largest of five such downtown liquor establishments. When Club Xtreme first opened, it drew 300 - 500 patrons per night. The Club did not have its own parking lot, so its patrons used a nearby municipal lot and several private lots.

Plaintiffs say that since the City could not prevent Club Xtreme from opening, it took steps from its inception to drive the Club out of business. For example, on the Club's opening night, the City's police officers conducted undercover operations inside and outside the Club, issuing numerous tickets for infractions, such as Michigan Liquor Control Commission ("MLCC") violations, littering, and open intoxicants. The police also created a special "Club Xtreme Detail" for increased patrols around the club, and targeted Club Xtreme with the City's Community Oriented Policing Crime Reduction Unit ("COPCRU") and its Metro Street Enforcement Team ("MSET"). Plaintiffs contend that other downtown bars were not subject to such intense police enforcement.

Concerned about possible police harassment of its patrons in July 2004 and June/July 2005, Club Xtreme hired a private investigator to conduct surveillance on the police. Club Xtreme says its investigator's reports illustrate the disparate treatment directed at Club Xtreme patrons. Plaintiffs say Club Xtreme's customer base dwindled

because of excessive police enforcement.  In an effort to appease the City and hopefully decrease the police enforcement, Club Xtreme voluntarily changed its music format on several occasions, from Top 40 to country.  When the music format changed to country, Club Xtreme's customer base dwindled to 40 - 50 customers per night.

To draw new customers, in October 2006 Club Xtreme changed the music format from country to hip hop and rap music, and hired DJ Gary Chandler of local radio station, Hot 102.7 FM.  This change led to a peak in business, and the customer base changed from primarily white to primarily black.  Club Xtreme says the police harassment reached new proportions with this demographic change; on at least two occasions, in January and February 2007, the police used a German shepherd police dog, and stationed an officer wearing a ski mask and armed with an automatic assault rifle outside the Club.

By 2007, the City apparently had concerns that Club Xtreme led to increased crime in the surrounding area, as a result of over-serving patrons and serving alcohol to minors; by that time, Club Xtreme had amassed 17 MLCC violations, and many patrons had been ticketed or arrested for public disorder and other crimes.  Wojtowicz says he had no control over patrons' acts in the parking areas, because police officers told him that he controls the inside of the Club and they control the outside.  In any event, the City's concerns were not voiced to Club Xtreme in a formal, written manner until February 2007.  Before then, in 2005 and 2006, Club Xtreme's liquor license was renewed by the State of Michigan as a matter of course, with no objection by the City.

The City scheduled a Special Meeting on February 26, 2007 at 6:30 p.m., to consider whether to object to renewal of the Club's liquor license.  On February 2, 2007,

the City sent notice to Club Xtreme via certified and regular mail. The Notice did not advise Club Xtreme of (1) the reasons for the proposed action, (2) what evidence, witnesses and testimony would be produced, or (3) the standards by which the decision would be made. The Notice also included no provision that Club Xtreme would be able to cross examine the City's witnesses or present evidence or testimony in Club Xtreme's defense.

Wojtowicz and Club Xtreme's attorney attended the February 26, 2007 hearing and objected due to Notice deficiencies. The city council continued with the hearing. Three police officers testified regarding the crime statistics and the City's law enforcement efforts. Several citizens and Wojtowicz testified, and his attorney cross-examined witnesses and argued before the city council. At the conclusion of the hearing, the council voted to object to the renewal of Club Xtreme's liquor license. The council made its decision without any established guidelines.

After the February 26, 2007 special meeting, the MLCC advised the City that the council's actions did not comport with MLCC regulations.

The city council scheduled a second hearing on March 28, 2007 at 7:00 p.m. On March 19, 2007, the City sent a Notice of Special Meeting to Club Xtreme via regular first class mail and certified mail, return receipt requested; this notice purportedly included proposed Guidelines for Class C Liquor Licenses, though it is not indicated on the Affidavit of Service. On March 20, 2007, the city council formally adopted the proposed guidelines. On March 21, 2007, the City sent a second Notice of Special Meeting. This second notice had the same hearing date, but changed the time to 6:00 p.m.; the notice purportedly included the adopted Guidelines for Class C Liquor

Licenses, though it is not indicated on the Affidavit of Service. Neither notice outlined

the reasons for the proposed action.

On March 28, 2007 at 6:00 p.m., the city council held the second special meeting

concerning the liquor license renewal. No representative for Club Xtreme was present.

The City presented no new testimony, and incorporated by reference the testimony from

the February 26, 2007 special meeting. The city council voted to object to the renewal

of Club Xtreme's liquor license. At the urging of the city attorney, Richard Clark, the

council outlined its reasons for the objection:

> Be it resolved that the City of Wayne objects to the Michigan Liquor Control
> Commission's Renewal of the License for the consumption of intoxicating liquors
> on the premises currently held by the owners/operators of Club Xtreme for the
> following reasons:
>     1. Licensee's failure to comply with all applicable city and state laws
> concerning the health, safety and moral conduct or public welfare incidents
> attaché Wayne Police Department report and letter from John Williams, Sergeant
> Dan Jurus and Sergeant Patrick Lindberg.
>     2. The Licensee's repeated violation of state liquor laws as noted in the
> report of Chief John Williams in Exhibit A.
>     3. The Licensee's maintenance of a nuisance upon or in connection with the
> licensed premises, specifically a pattern of patron conduct in the
> neighborhood of the licensed premises which is in violation of the law and/or
> disturbs the peace, order and tranquility of the neighborhood, as detailed in the
> attached reports as noted in the reports of Sergeant Patrick Lindberg (Exhibit B)
> and Sergeant Dan Jurus (Exhibit C).

See Def. Exh. 17. The meeting concluded at 6:12 p.m.

The parties dispute whether Wojtowicz and Club Xtreme received proper notice

of the second hearing. The March 19 and 21, 2007 notices went unclaimed at the post

office. Clark says by affidavit that he contacted Club Xtreme's then-attorney, Allan

Rubin, regarding potential witnesses. Clark says Rubin acknowledged receipt of the

5

notice and said he would not attend unless he was paid for his services. See Pl. Exh. 15.

Rubin says by affidavit that he does not recall either that conversation or receiving any notice from Clark's office, and review of his files shows no such conversation. See Pl. Exh. 12. Rubin's co-counsel, Lawrence Shulman, says by affidavit that he first learned of the hearing on March 28, 2007, when Clark called him to ask if he planned to call any witnesses; before then, he received no written or verbal notice of the second hearing. See Pl. Exh. 13. Shulman also says he told Clark that he and his client were unaware of the hearing. *Id.* Shulman says Clark told him the hearing was set for 7:00 p.m., but when Shulman arrived between 6:30 and 6:45 p.m., the parking lot was empty and the doors were locked. *Id.*

Club Xtreme closed in April 2007, after the MLCC did not renew its liquor license based on the City's recommendation.

On December 13, 2007, Plaintiffs filed suit. The Complaint alleges: Count I - Violation of First Amendment Rights, Count II - Violation of 14th Amendment Procedural Due Process Rights, Count III - Violation of Substantive Due Process Rights, Count IV - Denial of 5th Amendment Equal Protection Rights, and Count V - Violations of Plaintiffs' Constitutional Rights by Defendants Haidous, William, Damitio, Dobrowolski, and Zech.

Wojtowicz and Club Xtreme say they were subject to escalating police harassment, which culminated with Defendants' arbitrary recommendation denying renewal of Club Xtreme's liquor license with the State of Michigan. Wojtowicz and Club Xtreme allege the recommendation was due to the music format played by the Club (rap and hip hop) and the race and ethnicity of Club Xtreme's clientele (primarily black).

Defendants move for summary judgment on all claims.

## III. STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Nevertheless, nonmoving party must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

IV.     **ANALYSIS**

    A.  **Standing**

        1.  **Wojtowicz's Individual Standing**

Federal courts consistently hold that "an action to redress injuries to a corporation . . . cannot be maintained by a stockholder in his own name. . . . The general rule is applicable in cases where the individual is the sole stockholder." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 602-03 (6th Cir. 1988) (quoting *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir. 1968)). "This limitation on standing applies even to civil  rights claims brought in the place of corporations." *Quarles v. City of East Cleveland et al*, 1999 U.S. App. LEXIS 34061, *7-8 (6th Cir. 1999).

However, there is a well-recognized exception to this rule precluding shareholders from bringing individual actions:  "'Where the shareholder suffers an injury separate and distinct from that suffered by other shareholders,' or the corporation as an entity, the shareholder may maintain an individual action in his own right." *Id.* at *8.

Wojtowicz's claims are based on the city council's recommendation that Club Xtreme's liquor license not be renewed.  The Sixth Circuit recognized that in Michigan, only the holder of a liquor license has a protected property interest in the license. *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001); see also *Royal Oak Entm't, LLC v. City of Royal Oak, No. 04-72728*, 2005 U.S. Dist. LEXIS 6401, *15 (E.D. Mich. Apr. 14, 2005).  The liquor license was held by Club Xtreme only, and thus, only Club Xtreme had a protected property interest.

Wojtowicz claims that he lost his investment and suffered other economic harm as a result of the council's decision. However, although wage, investment, and other economic losses may flow to an individual from discriminatory harm suffered by a corporation, those injuries are not "separate and distinct" from those suffered by that corporation. See *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 603 (6th Cir. 1988).

Because Wojtowicz does not assert any specific damage or injury to him as a shareholder that is distinct from the damage or injury suffered by the entity Club Xtreme, he lacks individual standing to sue. Defendants' Motion for Summary Judgment is **GRANTED** on Wojtowicz's individual claims.

## 2. Equal Protection Claims

Club Xtreme brings Equal Protection claims on its own behalf and on behalf of its former black patrons. A party may assert the rights of others in very limited situations: (1) when the party asserting the right has a "close relationship" with the person possessing the right, when the party possessing the right is hindered in its ability to enforce that right, and (2) when the party bringing suit has had an action taken against it that results in the violation of a third party's right. *Kowalski v. Tesmer,* 543 U.S. 125, 129-30, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004).

Courts recognize that a business owner may have third party standing to assert a civil rights claim to remedy discrimination based on the race of the business' clientele. See e.g. *Craig v. Boren,* 429 U.S. 190, 195, 50 L.Ed. 2d 397, 97 S. Ct. 451 (1976) (Vendors may act as advocates of the rights of third parties who seek access to their

market or function); *Bilello v. Kum & Go, LLC.*, 374 F.3d 656, 660 (8th Cir. 2004) (Third-party standing for section 1981 claims is also permitted in cases involving discriminatory action taken directly against a non-minority person because of the person's relationship to, association with, or advocacy of minorities.).

Club Xtreme lacks standing to assert claims on behalf of its former black patrons because it has not established that they are subject to "some genuine obstacle" to asserting their own rights or that such assertion is "in all practical terms impossible." *Singleton v. Wulff*, 428 U.S. 106, 116, 126, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976). And, even if the City's actions were found unconstitutional and damages were paid to Club Xtreme, this would not redress its former patrons' injuries. *Conti v. City of Fremont*, 919 F.2d 1385, 1387-1388 (9th Cir. 1990).

However, Club Xtreme has standing to assert Equal Protection claims stemming from its own association with black patrons.

To the extent that Club Extreme asserts Equal Protection claims on behalf of its former black patrons, Summary Judgment is **GRANTED**.

### 3.  Claims for Declaratory and Injunctive Relief

Club Xtreme lacks standing to pursue declaratory and injunctive relief; it is no longer in business and does not assert that it would reopen if granted relief by this Court. See *Harris v. Itzhaki*, 183 F.3d 1043, 1050 (9th Cir. 1999) (holding that tenant subjected to racial discrimination by landlord did not have standing for injunctive and declaratory relief because she moved from building).

Summary Judgment is **GRANTED** on the claims for declaratory and injunctive relief.

### 4.  Claims under § 1985

Club Xtreme lacks standing under § 1985.  Section 1985 provides a private right of action to remedy injuries caused by a conspiracy to deprive an individual of civil liberties. *Taylor v. Brighton Corp.*, 616 F.2d 256, 264 (6th Cir. 1980).  State action is not required to assert a claim under § 1985, but the plaintiff must be a member of "some cognizable class which is the object of the conspiracy." *Macko v. Bryon*, 641 F.2d 447, 450 (6th Cir. 1981).  Club Xtreme has not established that it is a member of a protected class.

Even if Club Xtreme were a member of a protected class under § 1985, its conspiracy claim fails because it has made no specific allegations showing an agreement to discriminate based on prejudice against a class or particular group of persons of which it is a member. *Blackburn v. Fisk University*, 443 F.2d 121, 124 (6th Cir. 1971).  There must be some class-based animus; dislike for Club Xtreme in particular is insufficient. *Azar v. Conley*, 456 F.2d 1382 (6th Cir. 1972).

Summary Judgment on the § 1985 claim against the Individual Defendants is **GRANTED**.

### B.  Res Judicata and Collateral Estoppel

The United States Supreme Court held that federal claims that a plaintiff raised or could have raised in a state court proceeding cannot later be brought in a civil rights action in federal court. See *Allen v. McCurry*, 449 U.S. 90, 104, 101 S. Ct. 411, 66 L.

Ed. 2d 308 (1980); *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 83-86, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984).

A party asserting *res judicata,* or claim preclusion, must establish three elements: (1) a prior judgment on the merits; (2) an identity of the parties or their privies; and (3) an identity of the causes of action. See *Re/Max Int'l, Inc. v. Zames*, 995 F. Supp. 781, 785 (N.D. Ohio 1998); see also *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995).

Claims constitute the same cause of action for purposes of claim preclusion when they arise out of the same transaction and occurrence, or the same core of operative facts. See *In re Micro-Time Management Sys.*, 983 F.2d 1067, 1993 WL 7524, at *5 (6th Cir. 1993). If two claims arise from the same event and seek to redress the same basic wrong, they are identical causes of actions notwithstanding which specific facts the plaintiff relies on in stating a claim for relief. See *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir. 1991).

Defendants argue that Club Xtreme's claims are barred by the prior state court action, the criminal convictions, and the MLCC violations and pleas. Because Club Xtreme never appealed the MLCC violations or the City's resolution to the MLCC, Defendants say they are binding on the Club. However, the Club does not attack the validity of the MLCC violations in this action. Instead, Club Xtreme alleges procedural due process violations in the City's liquor license renewal hearings, and selective enforcement and disparate treatment with respect to police enforcement and City action. Moreover, the City has not established that the same parties and causes of actions were involved. *Res judicata* and collateral estoppel do not apply.

### C. Legislative Immunity

Individual members of local governmental bodies are absolutely immune from suit for damages under 42 U.S.C. § 1983 when conducting legitimate legislative activity. *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1993).

Because the Court concludes that Club Xtreme lacks standing to sue the individual Defendants under § 1985, the Court does not consider whether they are entitled to legislative immunity.

### D. Qualified Immunity

Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002).

Because the Court concludes that Club Xtreme lacks standing to sue the individual Defendants under § 1985, the Court does not consider whether they are entitled to qualified immunity.

### E. First Amendment Claim

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. Although freedom of expressive association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L. Ed. 2d 266 (1972).

There are two types of "freedom of association" protected by the United States Constitution: (1) choices to enter into and maintain certain intimate relationships are secured against undue intrusion by the state and receive protection as a fundamental element of personal liberty, and (2) a right to associate for the purpose of engaging in activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion. *City of Dallas v. Stanglin*, 490 U.S. 19, 23, 109 S.Ct. 1591, 1594, 104 L. Ed. 2d 18 (1989), citing *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984).

However, in *Stanglin*, the Supreme Court made clear that the Constitution does not recognize a general right of "social association" that includes chance encounters in dance halls. *Stanglin*, 490 U.S. at 24-25. The activity of dance-hall patrons coming together to engage in recreational dancing is not protected by the First Amendment, since that activity does not qualify as either a form of "intimate expression" or a form of "expressive association." *Id.* Similarly, a bar owner's relationship with patrons and employees is not the type of relationship protected by the First Amendment. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1188 (9th Cir. 1995).

Thus, to the extent that Club Xtreme's First Amendment claim is based on its patrons' right to associate at the club -- without any evidence linking such gatherings to a form of intimate association or to a form of expressive association or communication -- there is no First Amendment right to be protected.

However, Club Xtreme also suggests that the City impinged on its First Amendment rights because Club Xtreme changed its music format to rap and hip hop, resulting in more blacks frequenting the Club, because of that type of music. Club

Xtreme contends this precipitated the City's declining to recommend renewal of the liquor license.

In *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (2002), the Ninth Circuit found that club owners created a triable issue of a constitutional violation under the First Amendment where the club owners alleged the city pursued a campaign designed to stop downtown clubs from playing rap and hip hop music because the music attracted crime to the area. After enacting a public nuisance abatement ordinance, the city began a nuisance abatement action against appellants' club due to police reports and incidents of criminal activity in and around the club. The city made an offer to terminate the abatement action if the club owners stopped playing rap and hip hop music, but later withdrew it upon learning that the club still occasionally played rap music. This evidence raised a genuine issue of fact concerning a content-based restriction.

Here, the record does not support the claim that the City violated Club Xtreme's First Amendment rights by impermissibly discriminating against a particular musical viewpoint. There is no direct evidence that the City increased its police enforcement efforts due to Club Xtreme's choice of a new rap music format. Only council member Dobrowolski had been inside Club Xtreme, and her visit was around 6:00 p.m., before the Club opened for the evening. There is no evidence that she or the other Defendants knew what type of music was played at Club Xtreme.

Club Xtreme cites to Sergeant Lindberg's report, which the council relied upon in making its decision, as circumstantial evidence of discriminatory intent. Club Xtreme notes that for a 15-month period, from July 2005 through October 2006, no criminal activity was attributed to Club Xtreme, but once the music changed to rap and hip hop in

15

late October 2006, there was a slew of arrests and citations, the police used dogs and assault rifles for crowd control, and the City for the first time objected to renewal of Club Xtreme's liquor license.  However, 95% of the arrests occurred outside of the Club. Club Xtreme has not established that the police officers were aware of and acted based on the type of music played inside the Club.

The Motion for Summary Judgment on the First Amendment claims is

**GRANTED**.

### F.  Procedural Due Process Violation

A plaintiff must satisfy three elements to succeed on a procedural due process claim: (1) the plaintiff has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) the plaintiff was deprived of its interest within the meaning of the Due Process Clause; and (3) the state did not afford the plaintiff adequate procedural rights prior to the deprivation of its interest. *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

Citing MCL 24.301 and 24.306 as support, Defendants assert that Club Xtreme's procedural due process claim fails because Club Xtreme did not avail itself of any state law remedies after the city council's final decision.

However, a procedural due process claim brought under the Fourteenth Amendment does not necessarily require exhaustion of remedies. See *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) ("[A] procedural due process claim is instantly cognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency."); see

also *Bigelow v. Michigan Dep't of Natural Resources*, 970 F.2d 154, 160 (6th Cir. 1991) ("Nasierowski appears to stand merely for the sensible proposition that . . . the final decision rule does not apply when the denial of procedural due process itself creates an injury.").

One who seeks renewal of a liquor license has a vested property right which requires a due process hearing. *Bisco's, Inc v Liquor Control Comm*, 395 Mich 706; 238 NW2d 166 (1976); *Bundo v City of Walled Lake*, 395 Mich 679; 238 NW2d 154 (1976). The "rudimentary" due process afforded to liquor license holders consists of notice of the proposed action and the reasons for the action, a hearing in which the licensee may present evidence and testimony and confront adverse witnesses, and a written statement of findings on the part of the body taking the action. *Bundo*, 395 Mich at 696-697. Further, due process requires that the licensee be given notice of what criteria would result in a local body's initiation of nonrenewal/revocation proceedings. *Roseland Inn, Inc. v. McClain*, 118 Mich App 724, 731-732; 325 NW2d 551 (1982).

Defendants argue that Club Xtreme has no procedural due process claim based on lack of notice because Club Xtreme and its attorney received notice of both hearings. Defendants add that Club Xtreme and its attorney attended the February 26, 2007 meeting, cross examined the City's witnesses, and fully participated in the meeting.

However, the existence of theoretical procedural safeguards does not prove that Club Xtreme's rights were fully protected. Procedural due process requires more than a mere opportunity to be heard; it requires that the "opportunity must be at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545 (1965). "At its most basic level, procedural due process requires fairness." *Kentwood v. Sommerdyke*

*Estate*, 458 Mich. 642, 696; 581 N.W.2d 670 (1998).

Defendants served a Notice of Special Meeting dated February 2, 2007 via certified mail, return receipt requested. According to the return receipt card, Pamela Wojtowicz received the notice on February 3, 2007. The Notice, however, was facially defective, because it gave neither the reasons why city council might object to renewal of Club Xtreme's liquor license, nor the guidelines by which the council would render such a decision. *Bundo*, 395 Mich at 696; *Roseland Inn*, 118 Mich App at 729. Club Xtreme's counsel attended the hearing and objected based on the notice deficiencies, but the City continued with the hearing.

Seemingly conceding that the first notice and hearing was defective, the City scheduled a second special meeting on March 28, 2007. The parties dispute whether Club Xtreme received verbal or written notice. The City says that counsel's lack of recall does not defeat or create a genuine issue of fact as to whether the city attorney called him. Additionally, the City says any defects in the February 2, 2007 notice were cured by the second notice and hearing.

The Court finds this argument unavailing. There is a genuine issue of fact whether Club Xtreme and its attorneys received adequate notice of the second hearing. Interestingly, in the March 28, 2007 hearing transcript, there is no mention of any telephone conversations between the city attorney and counsel for Club Xtreme. In fact, the city attorney stated:

> ". . . We further indicated to him [Wojtowicz] in our letter that if he wants to submit additional proofs, information, whatever, they would be free to do so at this meeting relative to his license.
>
> I can say that I've received no communications from Mr. Wojtowicz. I've

received no communications from either of his attorneys who were here before. And they're not here and its now six minutes after six . . ."

See Def. Exh. 17.

Moreover, both the March 19 and 21, 2007 notices were facially defective because they failed to outline the reasons why city council might object to renewal of Club Xtreme's liquor license, in accordance with the dictates of *Bundo* and the City's own guidelines. Michigan law requires that any writing which is intended to be relied upon to constitute notice to another party, must be construed against the preparer of that notice. *Sroka v. Catsman Transit-Mix Concrete, Inc*, 350 Mich 672, 676; 86 NW2d 801 (1957); *Ben T. Young Co. v. Lafayette East Co.*, 56 Mich App 54, 57; 223 NW2d 361 (1974).

The Motion for Summary Judgment on the Procedural Due Process claim is **DENIED**.

### G. Substantive Due Process Violation

In contrast to procedural due process, the doctrine of substantive due process has been defined generally as "the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed . . . ." *Pearson v. Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992).

Plaintiff asserts an "arbitrary or capricious" substantive due process claim based on the City's denial of a liquor license renewal. Based on the allegations in the Complaint, Club Xtreme's First Amendment, Equal Protection, and substantive due process claims appear to arise out of the same set of facts.

19

The Sixth Circuit held that "a cause of action cannot be based on substantive due process where a more specific constitutional provision is applicable." *Brandenburg v. Hous. Auth. of Irvine*, 253 F. 3d 891 (6th Cir. 2001). at 900 (citing *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'")).

The Motion for Summary Judgment on the Substantive Due Process claims is **GRANTED**.

### H.  Equal Protection Claim

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.  A state cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally, without a rational basis for doing so, treat one differently from others who are similarly situated. *Vacco v. Quill*, 521 U.S. 793, 799, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997).

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co.*, supra, at 445 (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352, 62 L. Ed. 1154, 38 S. Ct. 495 (1918)).

In making an equal protection challenge, plaintiffs bear the initial burden of demonstrating that some type of discrimination has occurred against them which has not occurred against others similarly situated. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

Under a "class of one" equal protection theory, a claimant alleges that he was treated differently from others similarly situated, and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L. Ed. 2d 1060 (2000). A "class of one" plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill will. *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005).

Similarly, under a selective enforcement theory, a plaintiff must prove "the challenged law enforcement practice 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002) (citation omitted); see also *Harajli v. Huron Township*, 365 F.3d 501, 508 (6th Cir. 2004).

To establish discriminatory effect, plaintiffs "must demonstrate that similarly situated individuals of different race were not treated in similar manner." The second element, a discriminatory purpose, requires plaintiffs to allege facts sufficient to show that any unequal treatment by defendants was intentional or purposeful, and sought to discriminate against plaintiffs. To establish discriminatory purpose plaintiffs must show the disparate treatment was motivated by animus towards blacks. See *U.S. v. Jones*,

399 F.3d 640, 645 (2005).

Club Xtreme asserts that the City discriminated against it because its clientele changed to primarily black.  Club Xtreme notes the City never challenged its liquor license renewal when its clientele was primarily white, but only sought to object to renewal of the license when Club Xtreme's became primarily black.  Club Xtreme also cites to the City's formation of a Club Xtreme detail and the reports of Club Xtreme's private investigator, which concluded that the City's undercover police officers were constantly circling the lots used by Club Xtreme patrons, to a much greater degree than the other nearby bar establishments.

Club Xtreme says Sergeant Lindberg's report shows irregularities in the City's calculation of offenses attributed to Club Xtreme.  For example, if one person was arrested for an offense in the area near Club Xtreme and the police discovered through a LEIN search that he had two outstanding warrants from other cities, the City would count that as three arrests attributable to Club Xtreme.  Club Xtreme says the City's actions inflated the statistics of criminal activity attributed to Club Xtreme.

Additionally, in one incident, two intoxicated men left the nearby Village Bar and got into a fight with a group of men headed towards Club Xtreme.  One of the Village Bar patrons stabbed a man in the second group and was eventually convicted of assault with intent to murder.  The City attributed the incident to Club Xtreme because the victim was going to Club Xtreme.  Officer Williams admitted the report was generated in that fashion because other bars did not have the problems "associated with the patrons of the Club Xtreme."

Additionally, Club Xtreme presents the affidavit of former Club Xtreme General

Manager, Jonathon Nance, that in late October 2006, when the music format changed and the patrons became primarily black, the harassment of patrons reached a new level; officers brandished an assault rifle and stood with a German shepherd dog in front of the club. These claims are supported by photos, purportedly taken on January 26, 2007 and February 4, 2007, one of which shows an officer standing in front of the club with a police dog. With the exception of the officers, the crowd appears to be exclusively black. Another photo shows an officer outside, armed with what appears to be an assault rifle.

The City says it took action due to increasing liquor license violations, and that criminal activity near Club Xtreme actually decreased during the time Club Xtreme alleges the demographics of its patronage changed. Officer's Lindberg's report, however, shows that the number of MLCC violations decreased each year, with 10 in 2004, 5 in 2005, 2 in 2006 and 1 in 2007. In 2006, the City attributed 6 felony, 64 misdemeanor, 45 civil infraction/parking, 2 MLCC, and 33 misdemeanor warrant arrests to Club Xtreme, for a total of 150 violations. The previous year, the City attributed 7 felony, 60 misdemeanor, 4 civil infraction/parking, 5 MLCC, 5 misdemeanor warrants, and 1 gun arrest to Club Xtreme, for a total of 82 violations. Club Xtreme's breakdown of those arrests shows that of 15 arrests/citations issued in 2005, 4 went to white patrons and 11 went to black patrons, while in 2006, of 25 arrests/citations, 3 were issued to white patrons and 22 to black patrons.

The City denies knowing the race of Club Xtreme patrons and says it was never discussed internally. Officer Lindberg, however, admitted that the black patronage increased after the Club was open for several years, though he could not recall whether

it was discussed among other police officers and the city council.

In *RK Ventures*, supra, the court found a triable issue on the club owners' equal protection claim where they claimed selective enforcement action based on the race of their clientele. There was evidence the city and the police intimidated patrons, failed to respond to calls to render assistance, denied requests to hire off-duty police officers to provide security, threatened to shut down the club, encouraged local residents to complain, targeted the club owners for harassment ticketing, sought to have the club's liquor license revoked, initiated an abatement proceeding, and ultimately, forced the sale of the club. *Id*. at 1062-1063. An internal police department memorandum identified several "nontraditional" and "traditional" solutions to the problems, including voluntary early closure, voluntary change in the music format, working with the liquor board to suspend late night dance and music licenses, and utilizing the liquor board and the fire and health departments for a "code violations strategy." *Id*. at 1052.

There was also direct evidence of discrimination in *RK Ventures*, which consisted of (1) a councilwoman's notes, suggesting that black gangs were the problem and that problems could be controlled by music, and (2) statements by the city attorney that the music format drew young black males and violence. The direct evidence and the pattern of harassment raised a genuine issue of fact.

There is no direct evidence of discrimination. However, Club Xtreme presents sufficient circumstantial evidence to establish a genuine issue of fact, whether the City engaged in a course of conduct aimed at Club Xtreme which singled the Club out for disparate treatment because it catered to a primarily black clientele.

Summary Judgment is **DENIED** on the Equal Protection claim.

## VI.    CONCLUSION

The Court **GRANTS** Defendants' Motion for Summary Judgment on:

(1)  Wojtowicz's individual claims; (2) all claims for declaratory and injunctive relief; (3)

the First Amendment claim; (4) the Substantive Due Process claim; (5) the § 1985 claim

against the individual Defendants; and, (6) the Equal Protection claim on behalf of Club

Xtreme's patrons.

The Court **DENIES** the Motion on:

(1)  the Procedural Due Process claim; and, (2) Club Xtreme's Equal Protection claim.

These two claims will proceed to trial.

**IT IS ORDERED**.


s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  April 21, 2010

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
April 21, 2010.

s/Linda Vertriest
Deputy Clerk